**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 07-14030-CR-MARTINEZ(MOORE)LYNCH**

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

**v.**

**KURT ANDERSON,**

     **Defendant.**

_____/



FILED by _e_ D.C.

**JUN 2 2 2007**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S. D. OF FLA.

**REPORT AND RECOMMENDATION ON DEFENDANT'S**
**MOTION TO SUPPRESS STATEMENTS [D.E. #49]**

    **THIS CAUSE** having come on to be heard upon the aforementioned motion and this

Court having reviewed the motion, the government's response and this Court having

conducted an evidentiary hearing in respect thereto on June 20, 2007, this Court

recommends to the District Court as follows:

    1.    The Defendant's Motion to Suppress Statements seeks to suppress

statements he has made to the law enforcement officers in the State of Georgia shortly

after his arrest, statements made to members of the Port St. Lucie Police Department, as

well as a statement to agents of the Bureau of Alcohol, Tobacco and Firearms.  The

Defendant alleges in his motion that due to mental illness, threat by the law enforcement

officers with whom he spoke and his use of marijuana and cocaine immediately before his

arrest, that his waiver of <u>Miranda</u> rights was not voluntary. The Defendant's motion alleges

the following as reasons for suppression:

        a.    That the Defendant told the law enforcement officers in Georgia that

"his mind was going crazy";

b.      That the Defendant told the law enforcement officers that a psychiatrist had diagnosed him as being mentally unstable;

c.      That the Defendant had been smoking marijuana and cocaine just prior to his arrest;

d.      That the Defendant was threatened by detectives from the Cobb County, Georgia law enforcement agency who spoke with him;

e.      That the Defendant told detectives "if I don't take my medication, it throws me off";

f.      That the Defendant told the ATF agents that he was bipolar and had been threatened by the law enforcement officers from Cobb County;

g.      That the Defendant alleges that the law enforcement officers from Cobb County threatened him with "doing the rest of his life in jail" and "stressing his mother out" by saying they would contact her unless he confessed; and

h.      Based upon the fact that the Defendant cannot read.

2.      At the outset of the hearing, counsel for the Defendant objected that the detective from Cobb County was not present at the hearing.  While counsel did not make a specific hearsay objection, this Court finds that hearsay is admissible at a suppression hearing.  The Cobb County detective is a law enforcement officer in the State of Georgia. All of the compact discs containing copies of the Defendant's statements to the various law enforcement agencies in this case and which are subject to the Defendant's Motion to Suppress, were introduced into evidence as Government's Exhibits 1, 2, 3 and 4, inclusive. This Court confirmed on the record that all of these compact discs and the statements thereon have previously been provided to counsel for the Defendant pursuant to this

2

Court's Standing Discovery Order and that counsel for the Defendant has had time to review these statements individually and with the Defendant. Further, since all of the compact discs represent many hours of statements taken from this Defendant by the various law enforcement agencies, this Court stated that it could listen to the compact discs after this hearing unless there was some objection. Neither the government nor the Defendant objected to this procedure. Additionally, this Court stated on the record that if there were any specific portions which either counsel for the government or counsel for the Defendant wished to have played during the evidentiary hearing, this Court would permit them to do so. No specific portions were played. Both attorneys reiterated at various times during the hearings that the information contained on the compact discs represent all statements made by law enforcement officers and the Defendant in this case and that this Court could rely upon those compact discs in making its ruling in respect to various issues raised by the Defendant's Motion to Suppress.

3.     The government called Detective Ghobrial of the Port St. Lucie Police Department as its first witness. Detective Ghobrial stated that he first became involved in this case in February 2007 in respect to the robbery of the Publix and carjacking which occurred in St. Lucie County, Florida. On or about February 8, 2007, he traveled to the State of Georgia to interview the Defendant the day after the Defendant had been arrested.

4.     Detective Ghobrial had spoken with Detective Bishop, who was the lead detective of the Cobb County officers who arrested the Defendant. Detective Ghobrial discussed with Detective Bishop the interview of the Defendant which was taken by Detective Bishop and Detective Brown of Cobb County on or about February 8, 2007.

5.     Detective Bishop told Detective Ghobrial that after his arrest, the Defendant was placed in a holding cell for approximately fifteen minutes and then taken to an interview room. The audio equipment was operational in the interview room prior to the Defendant entering the interview room and was continuously operational for all periods of time while the Defendant was in the room, even at the time when the detectives actually left the Defendant in the room by himself. Therefore, all of the discussions between the Cobb County detectives and the Defendant are represented by the compact discs admitted into evidence in this case. Additionally, Detective Ghobrial testified that he has listened to these compact discs of the Defendant's statement as well and there are no breaks where the audio machine is turned off.

6.     Detective Ghobrial testified that according to Detective Bishop, approximately the first forty minutes of the interview of the Defendant were trying to obtain the proper identification of the Defendant. The Defendant gave a false name and date of birth. It took the detectives approximately forty minutes to determine the Defendant's proper identification. Shortly after getting this biographical information, the Defendant was read his <u>Miranda</u> rights. There were no questions concerning the underlying facts of this case aside from the Defendant's identity, prior to his <u>Miranda</u> warnings being read to him.

7.     The Defendant purportedly told the officers that he had problems reading. Detective Bishop then read the <u>Miranda</u> warnings to him line-by-line and had the Defendant acknowledge each right subsequently. Additionally, a written waiver was signed by the Defendant.

8.     Detective Bishop asked the Defendant as to whether or not he had been drinking or taking any drugs prior to his arrest and the Defendant said that he had not

4

Case 2:07-cr-14030-JEM Document 73 Entered on FLSD Docket 06/22/2007 Page 5 of 28

been. The Defendant did say that he had medications that he had previously been taking, but he could not recall the name of the medications nor could he recall his condition.

9.     The interview began at approximately 8:00 a.m. on or about February 8, 2007. As stated previously, the Defendant tried to tell the Cobb County officers that he was from Ethiopia, from Africa or from the Islands. In response to what language he spoke, the Defendant initially said "Gypsy." He also gave a false name and date of birth. It took approximately forty minutes for the officers to determine his true identity.

10.     Detective Ghobrial interviewed the Defendant the next day. His statement was recorded as well and is represented by one of the compact discs in this case, that being Government's Exhibit 3 in evidence. Government's Exhibits 1 and 2 are the recorded interviews of the Cobb County detectives involving this Defendant. Government's Exhibit 4 is the compact disc representing the interview of the Defendant by the ATF agents.

11.     During the interview with Detective Ghobrial, he told the Defendant that he would attempt to verify where the Defendant said he was at the time that these alleged crimes were committed. In doing so, Detective Ghobrial said that he would speak with the Defendant's mother and/or family to verify the Defendant's location since the Defendant said that he was playing dominos at his mother's residence at the time of these offenses. Detective Ghobrial said that he did not want to have to upset the Defendant's mother to verify this information.

12.     This Court has listened to each of the compact discs in evidence and will address in its analysis portion of this Report and Recommendation whether or not any of the allegations made by the Defendant are substantiated on those compact discs.

13. The defense called the Defendant, Kurt Anderson, to testify at this hearing. The Defendant testified that he is 25 years old. He has not received any psychiatric medications while he has been in custody on these charges. He claims to continue to have mental problems of being bipolar, having illusions, having visions and hearing voices. The Defendant stated that he requested medications while he was being held at the St. Lucie County Jail as a federal prisoner on these charges.

14. The Defendant testified that prior to his arrest in this case he was in the Martin County Jail and received medications there. He claims to have had mental problems when being held on unrelated charges in Martin County. He testified that when he was discharged from the Martin County Jail, he was given a prescription for Prozac and Vistaril. The Defendant also claims to have been receiving psychiatric medications since the age of 14 years old in Jamaica. While the Defendant first stated that he had never been hospitalized for any mental problems, he admitted that he did recall telling the doctor in the Martin County Jail that he had been hospitalized for seven days at some period of time. The Defendant claims that his diagnosis is that he is bipolar.

15. The Defendant introduced Exhibit 1 into evidence at this hearing as a composite exhibit containing the medical information of the Defendant while at the Martin County Jail. The exhibit reflects that the Defendant was provided Prozac and Vistaril during the time that he was at the Martin County Jail in October of 2006. The records also contain inmate request forms where the Defendant purportedly asked to see a doctor because of a skin rash, because of a mental problem and because he was hearing voices.

6

16.     From this Court's attempt to review the handwritten notes of the doctor at the Martin County Jail, it appears that in May of 2006 he was diagnosed with a rash. In August of 2006 he was diagnosed with depression and provided Prozac and Vistaril. In October of 2006, there is no diagnosis and there is only a continuation of the Prozac and Vistaril. There is also another entry in October of 2006 for Prednisone which no one mentioned at this hearing and this Court has no evidence of what that was in respect to.

17.     A review of the additional notes contained within Defendant's Exhibit 1 do not appear to come to any diagnosis, medical conclusion nor medical recommendation. There are self-serving documents concerning what the Defendant claims to be his problems. Medication such as the Vistaril was provided to the Defendant so he could "sleep better." The Defendant was provided medication to "decrease his depression." Documents also reflect the Defendant complained of being depressed, hearing voices at night and problems with fighting/anger. Further, the initial psychiatric evaluation under "disposition" indicates that the Defendant was counseled regarding anger management techniques in July of 2006.     Other than that, the mental status examination form indicates the Defendant's behavior was appropriate, he was cooperative, but had poor memory. The Defendant claimed to have hallucinations but no delusions. His speech was soft and slow and his mood was sad. The form indicates that he had no suicidal nor homicidal ideations. The final form in the packet appears to be dated December 2005 or 2006. This Court cannot tell from the date on the upper left-hand portion. However, this is an intake screening form and merely sets forth the Defendant's claims that he was diagnosed with depression in Jamaica. He claims to have been in a Kingston hospital in Jamaica for seven days.     There is nothing else in any of these medical records which would

7

substantiate the Defendant's allegations that he has been diagnosed as bipolar nor any other diagnosis of a mental illness or condition. Further, there is no evidence before this Court that the Defendant has ever been prescribed psychiatric medications or any other medications whatsoever aside from the Prozac and Vistaril which he was prescribed while he was an inmate at the Martin County Jail in 2006. This is important because the determining factor as to the Defendant's mental condition is what the detectives and other law enforcement agencies knew at the time that they took statements from the Defendant. If those officers had no prior knowledge of nor any reason to believe that the Defendant had a mental condition, they cannot be found to have taken advantage of that condition. However, this Court will elaborate on that legal issue during its analysis.

18.     The Defendant continued to testify at the Suppression Hearing that he told the law enforcement officers that his "mind was going crazy" and that without his medications he did not know what was going on. He claims to have told the Cobb County detectives, the Port St. Lucie detective and the ATF agents this information.

19.     The Defendant also testified that at the time of his arrest he was using drugs. In spite of the fact that he told the officers that he was not, he said that he was smoking marijuana and cocaine right before his arrest. He said that he lied to the detectives about his drug and alcohol use because he was afraid of getting charged with offenses arising from illegal use of drugs.

20.     The Defendant testified that he told the detective from the Port St. Lucie Police Department he had just smoked a "blunt", being marijuana laced with cocaine. The Defendant also claims to have smoked crack cocaine and flushed the pipe down the toilet

8

since it was not located by the detectives when they arrested the Defendant in his motel room.

21.     Defendant's Exhibit 2 is a photograph of the purported "blunt" and Guinness beer bottle that were found in the Defendant's motel room at the time of his arrest. The Defendant claims that the drugs affected his ability to know what was going on at the time of his arrest and shortly thereafter.

22.     The Defendant testified that the Cobb County detectives said that he was not going to see his mother anymore and that he was going to go away for 35 to 40 years. The Defendant said that he started crying. The Defendant testified that he told the Cobb County detectives "stuff" so they would not go see his mother. The Defendant testified that he was afraid that if his mother was told about these charges and his being in jail, that she might "have a stroke."

23.     The Defendant also testified that the Port St. Lucie detective said that he would go to the Defendant's mother's house to verify his story and this is why the Defendant went ahead and made his statements/confessions to the Port St. Lucie detective.

24.     On cross-examination, the Defendant admitted that he does not take medications all the time. He only took them when someone was looking after him. He did not like the medications and did not know what they were for.

25.     When asked how the officers would know that the Defendant was lying when he told them that he had not consumed alcohol or any narcotics, the Defendant stated that they should have just looked around the room and determined that he had been smoking marijuana and cocaine or they could have taken a blood test.

9

26.    The Defendant admitted that he barricaded himself in the room, and said that he did not know if there were police outside. He had initially left the room to go purchase another "blunt" and saw someone with a gun. He ran back to his room, not knowing if this person was a law enforcement officer. Once barricaded in the room, the Defendant claims to have smoked marijuana laced with powder cocaine and crack cocaine. When asked by counsel for the government as to why he was leaving the room to buy another "blunt" when he had some in the room already which he purportedly smoked after running back to his room, the Defendant stated that he wanted a "backup blunt."

27.    The Defendant confirmed on the record that he cannot read and that his Miranda rights were read to him by the detectives involved in this case.

28.    Neither the Defendant nor the government presented any other witnesses or evidence.    This Court has listened to each of the compact discs in evidence as Government's Exhibits 1, 2, 3 and 4. These discs contain the Defendant's statements to the various representatives of the Cobb County Police Department, Port St. Lucie Police Department and the Bureau of Alcohol, Tobacco and Firearms. The discs total just a little under six hours in length This Court has paid close attention to each of the discs in light of the allegations made by the Defendant in his motion. This Court cannot obviously relate in this Report and Recommendation everything that was said during the six hours of recorded statements of the Defendant. However, this Court will attempt to address the pertinent and appropriate portions of each disc separately so that this Court's later analysis is of assistance to the District Court.

29.    This Court points out that each of the statements made by the Defendant to law enforcement were made on separate days. Government's Exhibits 1 and 2 represent

10

statements made by the Defendant to representatives of the Cobb County Police Department. The evidence suggests that the statement to Detective Ghobrial of the Port St. Lucie Police Department, as represented in Government's Exhibit 3, was made the day after the Defendant's arrest. Further, the recorded statement of the Defendant to Agent Barborini of ATF was made at a time subsequent to the statement made to Detective Ghobrial. This Court has also had the opportunity to hear the Defendant testify in open court at the hearing in this case. The Defendant's demeanor, speech, comprehension and ability to communicate were found by this Court to be the same in court as is depicted on each of the separately recorded interviews with the various law enforcement agencies. This Court will now review each of the interviews separately.

30.    Government's Exhibits 1 and 2 represent statements made by the Defendant to Detectives Bishop and Brown of the Cobb County Police Department. The total time of the interview with these detectives was 2 hours and 32 minutes. As stated in the record, the interview was recorded and began at approximately 8:00 a.m. on the date of the Defendant's arrest.

31.    The first 6 minutes of the interview were spent obtaining biographical information from the Defendant which turned out to be wrong. The Defendant later admitted that he gave an incorrect name and date of birth. He also told the detectives that he was from the Bahamas and originally from Ethiopia. He later said that he was from Jamaica.

32.    The Defendant denied having any alcohol or drugs that day. Specifically, one of the detectives asked if the Defendant had taken any legal or illegal drugs and the Defendant denied taking any type of drugs that day prior to his arrest.

33.    The Defendant said that he reads and writes English and that he speaks "Gypsy".

34.    At approximately 6 minutes into the interview, the Defendant was read his Miranda rights by one of the detectives. The Defendant told the detective that he went to the ninth grade, but was not a good reader. Therefore, the rights were read line-by-line by the detective to the Defendant and the Defendant responded after each question that he understood his rights. Further, a written waiver of Miranda rights was read by the detective to the Defendant. The Defendant acknowledged his understanding of his rights and made a mark signing the waiver. Thereafter, the Defendant agreed to speak with the detectives.

35.    The Defendant told the detectives that he was in a motel and someone was yelling from outside about a stolen car. He did not know what was going on. He told them that he arrived in Georgia by way of a bus approximately two weeks before. He said he does not keep track of the time and is not a good reader. The Defendant said that when he talks, he thinks of a lot of things at the same time. However, the Defendant specifically said he was "not crazy."

36.    Approximately 37 minutes into the interview, the detectives obviously did not believe what the Defendant was telling them and they said that they were going to start over. They began again with the name and date of birth because the detectives said that they did not think that he was being truthful. The detectives told the Defendant that they would take his fingerprints and find out who he was eventually and if he was lying this could be another charge of giving false information to a police officer.

37.    At approximately 40 minutes into the interview, one of the detectives is heard telling the Defendant to tell them who he really is and stop playing games with them. The

12

Defendant then gave his correct name and date of birth. The detective then told the Defendant that his co-defendant told them all about the robbery and the carjackings in Florida. The Defendant denied knowing anything about any of this.

38.    The Defendant was able to discuss and answer all of the questions calmly. This Court heard no threats, coercion or allegations of threats by any of the detectives. The entire 2 hours and 32 minutes of interview was conducted in a calm, orderly and professional manner. The Defendant was cooperative and answered the questions in a courteous and appropriate way. There was never any indication that the Defendant was having problems with his memory, comprehension or understanding of the detectives or any of the questions they were asking.

39.    The Defendant said on the tape that he "isn't a dummy." He stated that he cannot read but that he can figure things out. One of the detectives asked the Defendant for his sister's phone number so that they could call the sister to check out the Defendant's alibi. The Defendant gave the detective the number and it was called during the interview. However, there was no answer. The Defendant was unable to give the address of his sister. The detective also obtained the Defendant's mother's name and telephone number from the Defendant. Again, the Defendant did not know his mother's address.

40.    At approximately 1 hour into the interview, one of the detectives told the Defendant that it was time to set the record straight. They indicated that they had already received all of the information about these crimes from his co-defendant prior to speaking with the Defendant. The detectives told the Defendant that the co-defendant cried and worried about his daughter. The detectives are heard telling the Defendant that both he and the co-defendant are looking at a lot of time in prison. The detectives told the

13

Defendant that they are simply looking for the truth. They told the Defendant that his co-defendant started off lying as they believed the Defendant was doing, but that the co-defendant later decided that it was best for he and his family to be truthful with them. The detectives told the Defendant that after speaking with the co-defendant, they let the Florida authorities know that the co-defendant had been cooperative and truthful with them.

41.     The detectives told the Defendant that he was being given the same opportunity to help himself. They asked the Defendant if he wanted them to tell the Florida authorities that he was uncooperative or to be able to tell the Florida authorities that he had been truthful and cooperative.

42.     At approximately 1 hour and 12 minutes into the interview, the detectives left the room to use the bathroom and the recording equipment was left on until the end of that first compact disc, Government's Exhibit 1.

43.     Government's Exhibit 2 picks up the interview when the detectives re-entered the interview room. At approximately 1 hour and 20 minutes into the interview, the Defendant is heard telling the detectives that he had been on medications for "a bipolar thing." He said that he is "not crazy or bipolar, just like bipolar." When the detectives asked when was the last time he had seen a psychiatrist, the Defendant said that he could not answer that.

44.     The detectives asked the Defendant what his mom did for a living and he told them that she was a nurse in Hobe Sound. The detectives asked the Defendant what his mother would think if the Defendant ended up disappointing her again by being arrested on these charges.

14

45.     The detectives confronted the Defendant and told him that they believed he was lying. The Defendant said he was just "trying to save his ass." The detectives again asked what the Defendant would tell his mother about what happened in Florida. The Defendant continued to deny robbing anybody or doing anything wrong.

46.     The detectives once again told the Defendant that he was being given the opportunity to be truthful. It was at this point that the Defendant rattled off his social security number in rapid fashion after having previously told the detectives that he did not know his social security number at the beginning of the interview. The detectives told the Defendant that if he did not want to take advantage of the opportunity to be truthful, then they were done with the interview. The detectives are heard telling the Defendant that they were advising him of this for his own good. They were not going to waste anymore time, but they would stay there all day if the Defendant wanted to try to help himself and be truthful.

47.     The detectives asked the Defendant if he knew how much time he was looking at in Florida for these crimes that he allegedly committed and it was the Defendant that responded 35 to 40 years. The detectives asked the Defendant if he thought his mother would still be alive when he got out of jail. There was no specific response to that question. The detectives also asked the Defendant what he thought the jurors would think if the Defendant continued with the statements he made about his non-involvement in these crimes and if the jurors determined that he had been untruthful.

48.     At approximately 1 hour and 42 minutes into the interview, the Defendant began admitting getting the gun from his co-defendant and he is heard crying during the interview. He stopped crying shortly thereafter. The Defendant then admitted his

15

involvement in the carjacking at the gas station but continued to deny any involvement in any robbery at the Publix or any other place in Florida.

49.     It is interesting to note that at approximately 2 hours into the interview, the Defendant is heard voluntarily stating that "that's what happened." The Defendant further states that "it's not like you beat it out of me." The Defendant is heard saying he was doing this for himself and his family.

50.     The detectives are overheard at a little over 2 hours into the interview thanking the Defendant for telling the truth. They told the Defendant that they would let the Florida authorities know and that it would help him. The detectives are heard at the end of the interview asking the Defendant if he wanted any more lemonade and to eat the muffin that apparently was given to him. The Defendant was told that he would be processed at their jail and then sent back to Florida. The detectives thereafter left the room at approximately 2 hours and 12 minutes into the interview. There is an additional 20 minutes on the disc which has the Defendant in the room alone without any detectives or other law enforcement authorities in there. The Defendant is heard sobbing on the compact disc.

51.     Government's Exhibit 3 is the statement of the Defendant given to Detective Ghobrial and Detective Lumpkin of the Port St. Lucie Police Department. This interview lasts approximately 2 hours and 36 minutes. At the beginning of the interview, one of the detectives is heard telling the Defendant that they are not going to involve the Defendant's family in this at all. The Defendant said that he had told Detective Bishop that he does not remember much. The detectives said that they were there to speak with him too because

16

it was a Port St. Lucie, Florida case. The biographical information of the Defendant took approximately the first 15 minutes of the interview.

52.    After the biographical information was obtained, one of the detectives read the Defendant his Miranda rights and asked specifically each question after each advice of rights. The Defendant said that he understood each of those rights as explained and agreed to speak with the detectives. The Defendant acknowledged that he knew that he could stop speaking with them at any time.

53.    The Defendant appeared cooperative on the compact disc. Both detectives were very courteous in their manner, demeanor and questioning of the Defendant.

54.    The Defendant admitted the carjacking, but said that he did not pull any gun out at the gas station when they took the gray Audi car. He stated that his co-defendant came to his house to get him to do this. The Defendant is heard saying that he has not taken his medications and this throws him off. There is no further questioning about this nor any further elaboration by the Defendant himself.

55.    Prior to his arrest, the Defendant said that he walked out to get something to eat and he received a call from the co-defendant saying that something was going on. He went outside to get a "blunt." He saw a "black dude with a gun" so he ran back inside. This "black dude" was yelling to stop and don't move. The Defendant said that he did not know that he was a police officer.

56.    There is some confusion in what the Defendant did next. It appears as though he called his family in Florida on the telephone and his family called the front desk at the motel to find out what was going on. It was thereafter that the Defendant found out

17

that there were police outside trying to arrest him. He had barricaded himself in his motel room.

57.     The Defendant claims to have been at home in Port St. Lucie with his family playing dominos before all of these crimes took place in Florida. He stated that his mother and family were there. After playing dominos he meditated/prayed before the co-defendant came by and got him. He stated that his family could corroborate all of this. The Defendant specifically is heard telling the detectives that they could call and ask his family to verify this information. The Defendant then said that he does not want to give his mother a stroke and the detectives are heard saying that they would never put pressure on his mother. The detectives said that they would check with the Defendant's mother and family just to make sure that he was telling the truth about where he was at the time prior to these crimes being committed.

58.     The detectives are heard telling the Defendant that they could check with the Defendant's brother in Port St. Lucie to avoid bothering the Defendant's mother. The detectives just reminded the Defendant to tell them the truth.

59.     The Defendant asked about the charges he was facing. The detectives said that it was a felony charge, but they could not tell him what the penalties were. The detectives are heard telling the Defendant that they had no authority to make any deal with him, but they could tell the appropriate authorities that he was telling the truth. They told the Defendant that this was his only opportunity to do so. They also informed the Defendant that this could become a federal offense because he had crossed state lines.

60.    The detectives told the Defendant that they will have to talk with his mother and family to verify things, but as long as they feel the Defendant was being truthful with them, they may not have to go talk to his family.

61.    The detectives told the Defendant that they knew he was at the Publix robbery and the Defendant finally admitted to being involved in that robbery after trying to tell the detectives that it was the co-defendant and another individual named Mike.

62.    At approximately 2 hours and 20 minutes into the interview, the Defendant tells the detectives that he cannot read when they were asking about how to find the people who were supposedly committing these crimes with the co-defendant.   The Defendant apparently did not know how to read street names or know street names.

63.    The Defendant asked the detectives if something could be done for him or if the Defendant could work for law enforcement to help himself.  The detectives told the Defendant that all they could do is make the appropriate authorities aware of the information he had provided and how cooperative the Defendant had been.

64.    It is interesting to note that the Defendant voluntarily stated that he knows the detectives are just doing their job.  The Defendant said that there had been no threats by these detectives and that he knows that they could not offer him any deals.  The detectives are heard saying once again that they would make all of this information known to the State Attorney's Office in Florida.  The Defendant is heard saying that he understands that they did not force or coerce him to make any statements and that what he had said was done freely and voluntarily.  The interview then ended.

65.    The final compact disc, Government's Exhibit 4 in evidence, is the interview of the Defendant with Agent Barborini of ATF.  There was another representative from the

19

Department of Justice in the room, but this Court could not ascertain who that individual was. This interview lasted approximately 47 minutes. The Defendant starts off by telling Agent Barborini that he had been threatened by the other law enforcement officers and that no Miranda rights had been read to him. Clearly, these statements are not true based upon this Court's review of those compact discs containing the Defendant's previous interviews. Agent Barborini then read the Defendant his Miranda rights and asked after each right if he understood those rights. The Defendant acknowledged that he understood them. Agent Barborini even offered the Defendant something to drink.

66.    The Defendant agreed to speak with the agents after they explained that they were there about the robberies and the carjackings that he allegedly was involved in with the co-defendant. Agent Barborini said that he would make known to the United States Attorney's Office any information and cooperation that the Defendant was able to give. However, Agent Barborini stated that he could not make any promises nor would he make any threats.

67.    Agent Barborini stated that he was trying to sort things out as to what the Defendant and co-defendant had said. He told the Defendant what his co-defendant had told them about the gun, carjackings and robbery. Agent Barborini also told the Defendant what they believed his involvement was in these crimes based upon the co-defendant's statements. This included the robbery at the Lil Saints store in Stuart.

68.    Agent Barborini talked about the charges and possible penalties on each of the crimes that the Defendant was presently charged with. Agent Barborini told the Defendant that all he was looking for was the truth.

20

69.    The Defendant tried to minimize his involvement in these alleged crimes and put it all on the co-defendant. He said the co-defendant was trying to put all of this on him.

70.    Agent Barborini then read to the Defendant what the Defendant had previously told the other officers of Cobb County and Port St. Lucie about being involved. The Defendant is heard telling Agent Barborini that he was actually lying to those detectives when he admitted his involvement.

71.    The agents are heard telling the Defendant that whoever cooperates gets the breaks. The Defendant is told that there is always a deal and that the co-defendant was confessing. They asked who did the Defendant think would get the break in this situation.

72.    Agent Barborini told the Defendant that he will be in jail for a very long time because Agent Barborini believed the Defendant committed these crimes. At the end of the interview, Agent Barborini says that if the Defendant gets an attorney and then later wants to talk, just to let him know. The interview then concluded.

## ANALYSIS

73.    In determining whether a confession is voluntary, the Court must assess the totality of all of the surrounding circumstances including the characteristics of the accused and the details of any interrogation/interview. The Court should focus on whether there was any police overreaching involved in any of the interviews. The factors the Court should look to include the Defendant's lack of education, lack of any advice concerning his constitutional rights, the length of detention, repeated or prolonged questioning and the use of any physical punishment such as deprivation of food or sleep. Dickerson v. United States, 120 S.Ct. 2326 (2000) and Waldrop v. Jones, 77 F.3d 1308 (11th Cir. 1996).

21

74.     In this case, there is absolutely no reason for this Court to believe that there was any coercion, threats or overreaching by any of the law enforcement agencies questioning the Defendant in this case.  This includes the representatives of the Cobb County Police Department, the Port St. Lucie Police Department and the Bureau of Alcohol, Tobacco and Firearms.  At all times the Defendant was coherent and responsive to the questions.  There is absolutely no indication that the Defendant sounded any different on any of these interviews from how he sounded in court testifying during the evidentiary hearing before this Court.

75.     While the Defendant claims that he was going crazy, his statements to the detectives and other law enforcement individuals are to the contrary.  The Defendant in fact said that he was not crazy.  The Defendant said that he had received medications at some time previous, but could not tell the detectives what the medications were nor the last time he saw a doctor.  In fact, the Defendant said he was not bipolar but something "like bipolar."

76.     The fact that the Defendant suffers from depression, as may be indicated by the medical reports of the Martin County Jail entered into evidence on behalf of the Defendant in this case, does not render any statements involuntary.  Further, any mental condition that the Defendant may claim to have would not automatically render his statements involuntary.  This Court should point out that there is no substantiation that the Defendant suffers from any mental condition or takes any medications for any such condition on a regular basis.  Unless it is found that the law enforcement officials took advantage of any mental illness, such condition, even if it did exist, does not render the

Defendant's statements involuntary. <u>United States v. Barbour</u>, 70 F.3d 580 (11th Cir. 1995).

77.     The Defendant was meticulously advised of his <u>Miranda</u> rights by each law enforcement agency who spoke with him.  No information was obtained prior to his being advised of his <u>Miranda</u> rights except for standard biographical information which is exempt from the purview of <u>Miranda</u>.  Since the Defendant did not read, each law enforcement agency read the Defendant his <u>Miranda</u> rights and meticulously made sure that he understood those rights before proceeding further.  In fact, the detectives of the Cobb County Police Department obtained a written waiver of <u>Miranda</u> from the Defendant.  As stated previously, there is no indication on any of these discs nor any other item of evidence, which would indicate that any law enforcement official interviewing the Defendant used any coercion, threats or subterfuge to take advantage of any mental condition the Defendant may have had.  <u>See</u> <u>also</u> <u>Colorado v. Connelly</u>, 107 S.Ct. 515 (1986).

78.     The Defendant stated that he went to the ninth grade, but could not read. Even if the Defendant had a low IQ or any other mental deficiency, those by themselves would not be sufficient to establish that any statements made by the Defendant were involuntary.  The Court must look at the totality of the circumstances and as such, this Court finds the Defendant clearly understood the questions being propounded to him and he calmly and appropriately responded.  <u>United States v. Wendehake</u>, 2006 WL 3498613 (S.D. Fla. 2006).

79.     The Defendant knowingly and intelligently waived his <u>Miranda</u> rights on each of the occasions speaking with these law enforcement officers separately.  Even though

the Defendant claims the inability to read or a low IQ, the Defendant specifically stated on each occasion that he understood those rights as they were read to him and agreed to speak with the law enforcement officers.  See United States v. Gaines, 987 F.Supp. 1432 (S.D. Fla. 1997).

80.     There is no indication in the record of any coercion, threats or other process used by any of these law enforcement authorities to obtain the statements made by the Defendant.  There is no indication that he was deprived of any food or drink.  In fact, on at least two of the compact discs, the Defendant is heard being offered something to drink and eat.  The shortest interview lasted 47 minutes.  The other two interviews lasted approximately the same amount of time, just a little over 2 hours and 30 minutes each. These were on separate days and not back-to-back.  This Court finds that a 2½ hour interview at one time is not an excessive amount of time.  Further, there is no evidence before this Court that the Defendant was deprived of sleep or otherwise tricked into making any of these statements.  Government coercion is a  necessary predicate to find the Defendant's confessions were involuntary.  There is no such evidence here.  United States v. Thompson, 422 F.3d 1285 (11th Cir. 2005).

81.     Specifically, the Defendant's motion alleges that he told the officers his mind was going crazy.  While the Defendant did make reference in these interviews to having taken medications for a mental problem in the past, he could not be more specific when asked.  Further, the Defendant on several occasions specifically said that he was "not crazy."

24

82.    The Defendant alleges in his motion that he told them a psychiatrist had diagnosed him as being mentally unstable.  The Court finds no such reference by the Defendant to any of these officers on any of the recorded interviews.

83.    The Defendant alleges that he had been smoking marijuana and cocaine and had told the officers that.  Specifically, he denied having taken any alcohol or narcotics, legal or illegal, prior to his arrest.

84.    The Defendant claimed that the Cobb County detectives threatened him.  There is absolutely no evidence of any threats on either of the discs involving the Cobb County detectives.

85.    The Defendant's motion alleges that he told the detectives "if I don't take my medication, it throws me off."   There may be some general reference to something like that and when the detectives inquired further, the Defendant could not be or refused to be more specific.

86.    The Defendant's motion alleges that he told ATF Agent Barborini that he was bipolar and that he had been threatened by the police in Georgia.  It is true that he started off the interview telling Agent Barborini that the detectives had threatened him, even though that is not borne out by the evidence.  However, this Court does not find any reference where he specifically went into his diagnosis of being bipolar with Agent Barborini.

87.    The Defendant's motion also alleges that the police in Georgia threatened him with doing the rest of his life in jail and "stressing his mother out" by contacting her unless he confessed.  Once again, the evidence is to the contrary.  The detectives indicated that they would have to contact his mother or family to verify his alibi or

25

information concerning what he was doing prior to these crimes being committed. Detective Ghobrial of the Port St. Lucie Police Department said that he would be doing the same. There are no threats made by the officers that they would hurt the Defendant's family or mother. There is nothing in any of these statements which would indicate that any of the law enforcement agents attempted to get statements from the Defendant by threatening to speak with the Defendant's family. The detectives simply said that they would be contacting his family and mother to verify the information the Defendant was giving them.

88.     Finally, the Defendant's motion alleges that he could not read. This is clear from all of the discs. Because of this, the law enforcement agents in interviewing the Defendant each read the Defendant his Miranda rights and had him acknowledge that he understood those rights before proceeding any further.

89.     The Defendant's motion alleges that based on his mental illness, threats and use of marijuana and cocaine, that his waiver of Miranda was not voluntary. Based upon these allegations concerning the first interview with the Cobb County detectives, the Defendant alleges that any subsequent interviews by the Port St. Lucie Police Department and the Bureau of Alcohol, Tobacco and Firearms is tainted fruit of the poisonous tree.

90.     This Court could not disagree any stronger. There is absolutely no evidence of any overreaching, coercion or threats by any of the law enforcement agents involved in this case. As stated previously by this Court several times herein, the Defendant calmly answered the questions in a courteous manner. Each of the law enforcement officers acted in a courteous manner in questioning the Defendant. The fact that the detectives advised the Defendant of the possible penalties that he was facing is not coercion or a

threat.  The fact that these detectives would have to contact the Defendant's family and mother to verify his alibi or whereabouts is not a coercive tactic or a threat either.  It was the Defendant that said that he was at home with his family prior to his co-defendant picking him up.  The Defendant was using this as an alibi concerning his statements that he was not involved in the Publix robbery that night.  Certainly, the law enforcement agents would have the right to speak with the Defendant's family and mother to verify this alibi and his whereabouts.

91.   This Court specifically finds that there is no basis for any of the allegations set forth in the Defendant's motion alleging any overreaching or coercive activity.  The Defendant did not sound any different during any of these interviews than he did in court during the evidentiary hearing before this Court.  At no time during any of the interviews, which lasted almost six hours in total length, did the Defendant indicate that he did not understand a question or appear to be suffering from any mental illness or effects of drugs or alcohol.  The Defendant clearly conversed in a reasonable and courteous manner with the law enforcement officers involved.

**ACCORDINGLY**, this Court recommends to the District Court that the Defendant's Motion To Suppress Statements [D.E. #49] be **DENIED**.

The parties shall have ten (10) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable K. Michael Moore, United States District Judge assigned to this case.

27

**DONE AND SUBMITTED** this 22 day of June, 2007, at Ft. Pierce, Northern Division of the Southern District of Florida.


FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE


cc:
Hon. K. Michael Moore
AUSA Corey Steinberg
AFPD Lori Barrist

28